IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BARBRA MILLER, | Case No. 1:22-cv-1448 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff, Barbra Miller, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. Miller challenges the Administrative Law Judge's ("ALJ") negative findings, arguing that the ALJ misevaluated both the opinion evidence and her subjective symptom complaints.

Any error in the ALJ's evaluation of the opinion evidence was harmless. But because the ALJ failed to apply proper legal standards in articulating the ALJ's reasons for rejecting Miller's vision-related subjective symptom complaints, the Commissioner's final decision denying Miller's application for DIB must be vacated and Miller's case remanded for further consideration.

I.      **Procedural History**

On June 26, 2020, Miller applied for DIB. (Tr. 193).[1] Miller alleged that she became disabled on May 15, 2020, due to "1. Back Injury [and] 2. Arthritis." (Tr. 193, 224). She later added myasthenia gravis as an impairment. (Tr. 233). The Social Security Administration denied Miller's application initially and upon reconsideration. (Tr. 105–10, 112–17). Miller requested an administrative hearing. (Tr. 134–35).

ALJ Penny Loucas heard Miller's case on July 12, 2021 and denied Miller's application in an August 3, 2021 decision. (Tr. 10–21, 67–103). In doing so, the ALJ determined that Miller had the residual functional capacity ("RFC") to perform work at the light exertion level, except that:

> [Miller] can never climb ladders ropes or scaffolds. She has unlimited balance[,] and all other postural limitations can be performed up to occasionally. She must avoid concentrated exposure to humidity and all exposure to unprotected heights, or work around dangerous moving machinery, such as power saws and jackhammers. She is limited to frequent use of hands when performing activities that require reaching, gross manipulation and fingering. She is further limited to frequent near acuity activities.

(Tr. 16–17). On June 13, 2022, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–3). On August 13, 2022, Miller filed a complaint to obtain judicial review. ECF Doc. 1.

II.     **Evidence**

    A.      **Personal, Educational, and Vocational Evidence**

Miller was born on July 14, 1966; she was 53 years old on the alleged onset date and 55 years old at the end of the period under adjudication. (Tr. 193). Miller completed high school in 1989 and had no specialized or vocational training. (Tr. 224–25). Miller had past relevant work

---

[1] The administrative transcript appears in ECF Doc. 7.

as an officer manager and gas station cashier, both which the ALJ determined Miller could still perform.  (Tr. 20, 225).

      **B.**      **Relevant Medical Evidence**

On May 6, 2020, Miller visited an urgent care clinic, reporting intermittent tingling in her extremities with ambulation over the past week.  (Tr. 271, 274).  She also reported back pain and soreness in her knees after standing at work for eight hours.  (Tr. 274).  Miller's physical examination results were remarkable for "mild paraspinal tenderness of L1-L2 and sacral area."  (Tr. 274, 276).  X-ray testing showed:

> … Grade 1 anterolisthesis of L5 over L6.  Mild-to-moderate disc space narrowing with endplate osteophytosis in the distal thoracic spine down through L1-2.  Slight disc space narrowing at L5-6 and L6-S1.  Interfacet hypertrophy with spur formation throughout the mid and distal lumbar spine, more pronounced distally.  Mild sclerotic arthritic changes in both SI joints.

(Tr. 277–78).  The attending nurse practitioner prescribed prednisone and instructed Miller to follow-up with her primary care physician.  (Tr. 273–74).

On May 12, 2020, Miller had a telehealth appointment with Palak Shroff, MD, reporting that she was doing "much better" since her visit to the urgent care clinic with rest and no prolonged sitting.  (Tr. 300).  Dr. Shroff diagnosed Miller with chronic lower back pain and prescribed stretching exercises.  (Tr. 302).

On May 27, 2020, Miller reported to Dr. Shroff that, although home exercises helped "some," she had intermittent lower back pain rated at 8/10 in severity.  (Tr. 303).  She reported that her back pain "comes on" with bending and walking and was alleviated by sitting and applying heat.  *Id.*  Miller's physical examination results were remarkable for "[s]ignificant stiffness" in her paraspinal muscles.  (Tr. 305).  Dr. Shroff prescribed cyclobenzaprine and referred Miller to physical therapy.  *Id.*

On June 10, 2020, Miller reported to Dr. Shroff that her condition was "better" with physical therapy. (Tr. 307). She also reported intermittent tingling in her hands and soreness in her toes. *Id.* She reported that the tingling was more frequent "during the day when she is doing stuff." *Id.* And she reported that her lower extremity symptoms were worse in the morning. *Id.* Miller's physical examination results were unremarkable. (Tr. 309). Dr. Shroff ordered an electromyography and nerve conduction velocity ("EMG/NCV") test for Miller's numbness and blood tests for polyarthralgia. (Tr. 309–10).

On June 29, 2020, Miller underwent EMG/NCV testing, conducted by Bashar Katirji, MD, FACP. (Tr. 313–15). The test results showed "no evidence" of carpal tunnel syndrome. However, Dr. Katirji's impression was that the study revealed "evidence of a prominent neuromuscular junction defect of the postsynaptic type[, which] is seen with myasthenia gravis as well as several neuromuscular blocking agents." (Tr. 315).

On July 30, 2020, Miller visited Dr. Katirji. (Tr. 320). Miller reported that she first experienced fatigue symptoms in April 2020, after which she gradually felt numbness in her extremities while lifting and walking. *Id.* She reported that she then developed weakness in her extremities and noticed that she could not tolerate prolonged lifting or walk more than 20 steps. *Id.* She reported that she noticed her symptoms mostly in the evenings, which also included double vision, and that her symptoms improved with naps or rest. (Tr. 319–20). Miller's physical examination results were remarkable for: (i) "weakness of eye abductions bilaterally;" (ii) "bilateral abducent palsy with double vision;" (iii) positive Romberg sign test; (iv) wide-base gait with steppage and easy fatigue; (v) reduced strength (between 3/5 and 4/5) in her triceps and with finger flexion and extension, wrist flexion and extension, hip flexion, and foot dorsiflexion; (vi) "abnormal" Cranial nerves III, IV and V; and (vii) reduced ankle reflex. (Tr. 319, 322).

MRI testing results showed multilevel degenerative changes, no significant canal stenosis or foraminal stenosis, and a variable degree of facet osteoarthropathy at multiple levels. (Tr. 322, 342). Dr. Katirji stated that Miller's objective exam results and reported symptoms were most consistent with seronegative generalized myasthenia gravis and prescribed Mestinon. (Tr. 319).

On August 13, 2020, Miller reported to Dr. Katirji that she was "doing better" and noticed "significant improvement." (Tr. 358–59). Her physical examination results were remarkable for "mild bilateral VI nerve palsy, more at left eye" and reduced strength (4/5) with arm, finger, and wrist extension, finger abduction and adduction, hip flexion, and left foot dorsiflexion. (Tr. 360). Dr. Katirji stated that, despite improvement in Miller's strength, Miller still exhibited "significant" muscle and lower extremity weakness. (Tr. 358). Dr. Katirji increased Miller's dosage of Mastinon and prescribed prednisone. (Tr. 354, 358).

On November 5, 2020, Miller reported to Dr. Katirji that she got no significant improvement with prednisone. (Tr. 356). She further reported that she took "many breaks" when she went shopping, could not lift above shoulder level, and developed double vision and droopy eyelids at the end of the day. *Id.* Her physical examination results were remarkable for: (i) "bilateral rectus palsy;" (ii) 3/5 strength with thigh flexion and left foot dorsiflexion; (iii) 4/5 strength with forearm extension and right foot dorsiflexion; and (iv) "abnormal" Cranial nerves III, IV and V. (Tr. 357). Dr. Katirji ordered the use of a "Disability Placard; handicap placard for 5 years" and increased Miller's dosage of prednisone, noting that Miller had "improved" with prednisone. (Tr. 354–55).

On December 10, 2020, Miller reported to Dr. Katirji "some" leg weakness and gait instability. (Tr. 351). Her physical examination results were remarkable for: (i) "mild weakness of lateral rectus bilaterally without ptosis despite sustained upgaze;" (ii) "slight" weakness with

5

forearm extension and hip flexion; and (iii) the need to use both hands to rise from a sitting position. (Tr. 352). Miller declined immunosuppression treatment in favor of an increased dosage of prednisone. (Tr. 350).

On February 11, 2021, Miller reported to Dr. Katirji that she received "significant body strength improvement" with prednisone but still had double vision. (Tr. 381, 383). Her physical examination results were remarkable for "bilateral rectus weakness with double vision at the end of gaze" and 4/5 strength with left hand adduction and thigh flexion. (Tr. 384). Dr. Katirji prescribed azathioprine. (Tr. 381).

On May 6, 2021, Miller reported to Dr. Katirji that she did not notice any significant change with azathioprine. (Tr. 410). She reported "significant double vision and struggle with stairs." *Id.* Her physical examination results were remarkable for "bilateral rectus weakness L>R with double vision at the end of gaze" and 4/5 strength with right triceps flexion and extension. (Tr. 411–12). Due to elevated liver function blood tests, Dr. Katirji stopped azathioprine pending the results of a repeat blood test. (Tr. 409).

On June 24, 2021, Miller reported to Dr. Katirji that, although she struggled to climb stairs, she could walk with "little to no assistance." (Tr. 433). She reported that she experienced "[d]iplopia … when she is tired [which] improves with rest and medication." *Id.* Her physical examination results were remarkable for: (i) "bilateral lateral rectus weakness L>R with double vision at the end of the gaze;" (ii) "slightly weak" eye closure; and (iii) 4/5 right triceps strength. (Tr. 434). Dr. Katirji noted that Miller appeared "stable," with some remaining weakness and double vision. (Tr. 431–32). Dr. Katirji prescribed Mycophenolate. (Tr. 432).

6

### C. Relevant Opinion Evidence

#### 1. Treating Source – Bashar Katirji, MD, FACP

Dr. Katirji completed three medical source statements indicating his opinions on Miller's physical limitations. *See* (Tr. 347–48, 372–73, 388–89).

On December 16, 2020, Dr. Katirji opined that Miller could: (i) lift 10 pounds occasionally and 5 pounds frequently; (ii) stand/walk for up to 30 minutes with 10-minute breaks; (iii) sit without limitation; (iv) never climb, balance, stoop, crouch, crawl, or kneel; (v) rarely reach or perform fine manipulation; and (vi) occasionally push/pull or perform gross manipulation. (Tr. 347–48). Dr. Katirji further opined that Miller experienced "moderate" lower back pain, needed to alternate positions at will, and needed to take breaks every one to two hours. (Tr. 348).

On February 18, 2021, Dr. Katirji opined that Miller could: (i) lift 10 pounds occasionally and 5 pounds frequently; (ii) stand/walk for up to 30 minutes with 10-minute breaks; (iii) sit without limitation; (iv) never stoop, crouch, kneel, and crawl; (v) rarely balance, climb, reach, and perform fine manipulation; and (vi) occasionally push/pull and perform gross manipulation. (Tr. 372–73). Dr. Katirji reiterated that Miller had "moderate" lower back pain with a need to alternate positions and take breaks every one to two hours. (Tr. 373).

On May 6, 2021, Dr. Katirji opined that Miller could: (i) lift 15 pounds occasionally and 10 pounds frequently; (ii) stand/walk for 15 minutes at a time and for "less than 1/2 hrs with frequent breaks;" (iii) sit without limitation; (iv) never stoop, crouch, kneel, and crawl; (v) rarely climb and balance; (vi) occasionally reach, push/pull, and perform fine manipulation; and (vii) frequently perform gross manipulation. (Tr. 388–89). Dr. Katirji further opined that Miller

7

had "mild to moderate lower back pain," reiterating that Miller needed to alternate positions and take breaks every one to two hours. (Tr. 389).

In all three medical source statements, Dr. Katirji noted that Miller had a wheelchair, though she was never prescribed one. (Tr. 348, 373, 389).

### 2. State Agency Consultants

On September 11, 2020, Mehr Siddiqui, MD, evaluated Miller's physical capacity based on a review of the medical record. (Tr. 108–09). Dr. Siddiqui found that Miller could: (i) lift 20 pounds occasionally and 10 pounds frequently; (ii) stand/walk for 6 hours in an 8-hour workday; (iii) never climb ladders, ropes, and scaffolds; (iv) frequently climb ramps and stairs; (v) frequently balance, stoop, kneel, crouch, and crawl; and (vi) balance without limitation. (Tr. 108).

On December 29, 2020, Lynne Torello, MD, concurred with Dr. Siddiqui's assessment of Miller's exertional limitations and ability to balance and climb ladders, ropes, and scaffolds. (Tr. 114). However, Dr. Torello additionally found that Miller could only occasionally stoop, kneel, crouch, and crawl. (Tr. 115).

### D. Relevant Testimonial Evidence

Miller testified at the administrative hearing that the reason she stopped working was because she was no longer able to perform the standing and walking requirements of her job as a gas station cashier without falling. (Tr. 79–81). She testified that her treating neurologist ultimately diagnosed her with myasthenia gravis. *See* (Tr. 83). She testified that she regained sufficient strength with medication treatment to be able to "walk and do things," albeit with breaks. (Tr. 85–86). After an hour of standing, she testified that her legs got "weak and heavy and I have to sit down." (Tr. 86). And after sitting for an hour, she testified that she needed to

stand and move around because "[m]y feet get tingly and then my back starts bothering me." (Tr. 86–87, 92–93). She testified that she was not receiving treatment for her back pain. (Tr. 93).

Miller testified that she also experienced weakness in her upper extremities. (Tr. 87). She testified that after 30 minutes of typing "my hands get tingly and they start getting numb," after which she would take a 15-minute break. *Id.* She testified that with each break, her stamina wore down. *Id.* She also testified that she had to be careful lifting above her head because "my arms feel like they're going to give out." (Tr. 92).

And Miller testified that she had double vision as part of her myasthenia gravis. (Tr. 90). She testified that she started to experience double vision and blurry vision after focusing (i.e., driving or looking at a computer monitor) for 30 minutes. (Tr. 90–91). She testified that her vision otherwise fluctuated depending on what tasks she performed. (Tr. 91–92). She testified that when she experienced symptoms she would sit down and shut her eyes for 15 minutes, after which she could focus for about 15 minutes before needing another break. (Tr. 92).

Miller testified that on a typical day she could perform household tasks, with breaks, between 8:00 a.m. and 3:00 p.m. (Tr. 88–89). She testified that as the day went on, and particularly after 3:00 p.m., she got progressively more tired. *Id.* She testified that she could cook, clean, dust, and vacuum but struggled with stairs. (Tr. 89, 91).

Vocational expert ("VE") Gene Burkhammer testified that a hypothetical person with the ALJ's proposed limitations could perform Miller's past work as an officer manager, which the VE determined was sedentary-exertion-level work, and gas station cashier, which the VE determined was light-exertion-level work. (Tr. 97–100). If the individual were further limited to lifting and carrying 15 pounds occasionally and 10 pounds frequently and needed to alternate

9

between sitting and standing every 30 minutes, the VE testified that the individual could still work as an office manager. (Tr. 101). But if the individual were limited to occasional handling, fingering, and feeling, the VE testified the individual would not be able to perform Miller's past work. (Tr. 100). The VE further testified that the threshold employer tolerance for off-task behavior was 15%, which would include taking two additional 15-minute breaks due to eye strain. (Tr. 100–02).

### III. Law & Analysis

#### A. Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *Id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

#### B. Step Four – Opinion Evidence

Miller argues that the ALJ failed to apply proper legal standards in her evaluation of Dr. Katirji's opinions. Miller argues that the ALJ did not explain on what basis the ALJ rejected

Dr. Katirji's opinion regarding Miller's standing, walking, postural, and manipulative limitations, focusing instead on her ability to lift and carry and use of a wheelchair. ECF Doc. 8 at 15, 17–18. Miller argues that treatment notes reflecting lower extremity weakness corroborated Dr. Katirji's proposed standing and walking limitations. ECF Doc. 8 at 15, 17. And she argues that the ALJ's reasoning reflected a misunderstanding of the lifting and carrying requirements of work at the light exertion level. ECF Doc. 8 at 16. The Commissioner disagrees. ECF Doc. 9 at 7–10.

    At Step Four of the sequential evaluation process, an ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[2]. According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

    The ALJ arguably failed to apply proper legal standards in her analysis of Dr. Katirji's opinions. 42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405. The ALJ addressed all three of

---

[2] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

11

Dr. Katirji's opinions together, concluding that: "[T]he functional assessments that restrict the claimant to a reduced range of sedentary work restrictions, including the use of a wheelchair, are not supported by his own treatment notes. (Exhs. 5F, pp. 5-6; 6F; 8F; *but see* Exhs. 2F, pp. 5, 17, 21, 24, 28; 3F, pp. 3-5, 8-12; 7F, p. 8; 10F, p. 3; 12F, p. 9; 13F, pp. 16-17). … Accordingly, the undersigned is not persuaded by Dr. Katirji's medical source statements." (Tr. 19).

The ALJ did comply with the regulations to the extent that she grouped Dr. Katirji's opinions and analyzed them together. 20 C.F.R. § 404.1520c(b)(1). The ALJ expressly considered the supportability of Dr. Katirji's opinions when the ALJ remarked on the degree to which Dr. Katirji's treatment notes corroborated the limitations espoused in Dr. Katirji's opinions and cited some of Dr. Katirji's treatment notes. And the ALJ implicitly considered the consistency of Dr. Katirji's opinions when the ALJ cited some of Dr. Schroff's treatment notes. Specifically, the ALJ cited: (i) Dr. Shroff's treatment notes from January 16, 2020, May 4, 2020, May 12, 2020, May 27, 2020, June 10, 2020, and March 18, 2021; (ii) Miller's EMC/NCV test results; and (iii) Dr. Katirji's treatment notes from July 30, 2020, February 11, 2021, May 6, 2021, and June 24, 2021. (Tr. 19 (citing Tr. 284, 296, 300, 307, 313–15, 318–22, 381, 396, 412, 433–34)). And the ALJ discussed the lack of objective support in the medical record for some of the limitations in Dr. Katirji's opinions. *See* (Tr. 18–19). Although the ALJ's discussion was hardly elaborate, it was sufficient to satisfy the regulatory requirement that the ALJ analyze the supportability and consistency factors. 20 C.F.R. § 404.1520c(b)(2).

Where the ALJ arguably erred was in how well she explained her analysis of Dr. Katirji's opinions. The ALJ did not explain in what way "the EMG test results and the longitudinal objective neurological and musculoskeletal examination findings" she cited contradicted Dr. Katirji's opinion on Miller's exertional, postural, and manipulative limitations and Miller's

12

need to take breaks every one to two hours. *See* (Tr. 18–19). What little the ALJ did say was, in effect, that Miller's reported ability to walk with "little to no assistance" was inconsistent with Dr. Katirji's opinion that Miller required the use of a wheelchair and was limited to a reduced range of sedentary-exertion-level work. (Tr. 19). But, as Miller notes, Dr. Katirji did not opine that Miller was prescribed, or required the use of, a wheelchair. (Tr. 347, 372, 388). And being able to walk without assistance does not necessarily contradict Dr. Katirji's opinion that Miller could stand and walk for up to 30 minutes with 10-minute breaks. *Id.*

The ALJ also stated that "one could be lifting 5 pounds frequently during the day and 15 pounds once a week and still meet the requirements of light exertion." (Tr. 18). That statement could be read as a finding that Dr. Katirji's opinion limiting Miller to lifting no more 5 to 10 pounds frequently and 10 to 15 pounds occasionally was consistent with the ability to work at the light exertion level.[3] There could perhaps be jobs at the light exertion level that Miller could perform without needing to lift 20 pounds occasionally, but that would be irrelevant to the supportability and consistency of Dr. Katirji's opinions. The ALJ's function at Step Four was to determine the *most* that Miller could do despite her impairments. 20 C.F.R. § 404.1545(a)(1). Dr. Katirji's opinion that Miller could lift no more than 15 pounds frequently would, by definition, be inconsistent with an RFC finding that Miller could lift and carry at the full range of the light exertion level, as the ALJ found here. SSR 83-10, 1983 SSR LEXIS 30, at *13 (1983) (defining work at the light exertion level); (Tr. 16).

---

[3] The Commissioner reads the ALJ's statement as "merely explaining how RFCs work." ECF Doc. 9 at 10. We disagree. Although it is true that a job at the light exertion level does not necessarily require that an individual perform the full range of light work all 40 hours of the workweek, it is difficult to conceive of what purpose the ALJ's statement could serve other than as a finding that Dr. Kitirji's proposed lifting and carrying limitations were consistent with an RFC finding that Miller had the ability to lift and carry at the light exertion level.

13

The omissions discussed above inhibit the ability of the court, as a future reviewer, in our analysis of the ALJ's reasoning. *Fleischer*, 774 F. Supp. 2d at 877. Nevertheless, the ALJ's minimal compliance with the regulation's articulation requirements did not cause harmful error. *Rabbers*, 582 F.3d at 654. The ALJ's finding that Miller could perform her sedentary-level past relevant work as an office manager rendered harmless any error in the ALJ's failure to adopt Dr. Katirji's opinion that Miller could lift no more than 5 pounds frequently or 15 pounds occasionally. *See* SSR 83-10, 1983 SSR LEXIS 30, at *12; (Tr. 20). And any error in the ALJ's failure to adopt Dr. Katirji's opinion that Miller could not walk more than 30 minutes and needed to alternate positions was rendered harmless by the VE's testimony that those limitations would not preclude Miller's ability to work as an office manager. (Tr. 101).

Dr. Katirji's opinion on Miller's postural and manipulative limitations all stem from the effects of generalized weakness. (Tr. 347–48, 372–73, 388–89). A common sense reading of the ALJ's decision indicates that the ALJ rejected those limitations as inconsistent with Miller's generally unremarkable physical examination results throughout the period under adjudication. *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010). And the ALJ cited evidence a reasonable mind could accept as adequate to support that conclusion, including objective examination results reflecting: (i) normal or slightly reduced (4/5) upper and lower extremity strength; (ii) normal gait without spasticity, ataxia, or bradykinesia; (iii) stable stance; and (iv) normal sensory exam. *See* (Tr. 15–19); *see also* (Tr. 357, 365–66, 384, 396, 411–12, 434).

That leaves Dr. Katirji's opinion that Miller required breaks every one to two hours, depending on the degree of activity required. However, Dr. Katirji's medical source statements provided no explanation to justify that limitation. Dr. Katirji merely checked a box indicating

14

that Miller required additional rest periods beyond the standard two 15-minute breaks and half-hour lunch and wrote as an answer to a fill-in-the-blank question that Miller needed a 15-minute break every 1 to 2 hours. (Tr. 348, 373, 389). Opinions expressed in such a manner are considered "so patently deficient that the Commissioner could not possibly credit it." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *see also Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474–75 (6th Cir. 2016).[4] And a court may affirm the ALJ's evaluation of a medical opinion even when the ALJ does not call attention to the patently deficient nature of it. *Marks v. Comm'r of Soc. Sec.*, No. 1:16-cv-02848, 2018 U.S. Dist. LEXIS 20220, at *23 (N.D. Ohio Jan. 12, 2018) (collecting cases).

Thus, there is no basis for remand on account of Miller's challenge to the ALJ's evaluation of the opinion evidence.

    **C.**    **Step Four – Subjective Symptom Complaints**

Miller argues that the ALJ failed to apply proper legal standards in the ALJ's evaluation of Miller's subjective symptom complaints of double vision. Miller argues that the ALJ's finding that her double vision was "unexplained" was contrary to Dr. Katirji's neurological findings, which connected her vision impairment to muscle weakness. ECF Doc. 8 at 20. Miller argues that the ALJ mischaracterized her vision impairment as worsening when she was tired, when she actually reported that it worsened as they day went on. *Id.* Miller argues that the ALJ misinterpreted Dr. Katirji's statement that her ocular symptoms improved to mean that her vision impairment did not limit her functioning. ECF Doc. 8 at 21. And Miller argues that the RFC

---

[4] Although the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied the analysis to the post-March 27, 2017 regulations. *See, e.g.*, *Hickman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6030, 2021 U.S. Dist. LEXIS 215187, at *14 n.5 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, 20-cv-1199, 2021 U.S. Dist. LEXIS 134907, at *33 n.8 (W.D. Tenn. July 20, 2021); *Burba v. Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 U.S. Dist. LEXIS 179252, at *11–12 (N.D. Ohio Sept. 29, 2020).

failed to account for the length of time she could use her eyes and her need for breaks, focusing instead on the sharpness of her vision (near acuity). *Id.* The Commissioner disagrees. ECF Doc. 9 at 6–7.

As stated above, at Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant and other evidence. 20 C.F.R. § 404.1520(e). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5, at *14 (July 2, 1996). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *13–14.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 649, 475–76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016). If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The ALJ failed to apply proper legal standards in her evaluation of Miller's vision-related impairment. 42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405. The ALJ did comply with the regulations to the extent that she: (i) assessed Miller's RFC in light of the medical evidence, her testimony, and other evidence in the record; and (ii) clearly explained that the ALJ rejected

16

Miller's because Miller's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence. 20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3–4, 11–12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13–15; (Tr. 17–20). And although not expressed in a single paragraph, the ALJ provided throughout her decision sufficiently clear reasons for rejecting the severity of Miller's subjective symptom complaints: (i) Miller did not seek treatment with an ophthalmologist; (ii) Dr. Katirji repeatedly qualified Miller's double vision as "mild" and not "significant;" and (iii) the evidence did not demonstrate functional limitations beyond those in the ALJ's RFC findings. (Tr. 13, 19).

However, these reasons are problematic. The ALJ correctly observed that Miller did not seek treatment with an ophthalmologist. In some cases, the failure to seek treat with the appropriate specialist can be evidence inconsistent with the severity of a claimant's subjective symptom complaints. *See, e.g.*, *Sarber v. Berryhill*, No. 2:16-CV-154, 2017 U.S. Dist. LEXIS 138437, at *15–18 (E.D. Tenn. Aug. 29, 2017); *Baker v. Comm'r of Soc. Sec.*, 2:15-cv-2687, 2016 U.S. Dist. LEXIS 108395, at *22–23 (S.D. Ohio Aug. 16, 2016). That's not the case here. Miller sought and received treatment from the appropriate specialist for myasthenia gravis (a neurologist), one of the symptoms of which is double vision. Myasthenia Gravis, U.S. National Library of Medicine, https://www.ninds.nih.gov/health–information/disorders/myasthenia-gravis (last visited February 24, 2023).

The ALJ also correctly observed that Dr. Katirji remarked that Miller's double vision was "mild." Miller reported, and Dr. Katirji noted, that Miller's ocular symptoms were not "significant" and that her double vision was "mild" in July 2020. (Tr. 319). But by May 2021, Miller referred to it as "significant" in severity. (Tr. 410). The ALJ did not explain on what basis the ALJ chose to give more weight to the earlier characterization of Miller's symptoms,

17

given that the issue to be decided was whether Miller was disabled on or before the date last insured (August 3, 2021). *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990); (Tr. 12). And although Dr. Katirji stated that Miller's neurological symptoms improved "significantly" with medication treatment, those statements referred to Miller's general body weakness, not Miller's double vision, which Dr. Katirji repeatedly noted was a continuing issue. *See* (Tr. 381–83, 410–11, 431–33).

Also problematic is the ALJ's finding that the evidence did not demonstrate greater functional limitations than those already reflected in the RFC. For example, the ALJ did not explain in what way the evidence the ALJ cited contradicted Miller's testimony that she could only focus her gaze for 30 minutes before needing to take a 15-minute break, after which her visual stamina would gradually decrease. Such reasoning leaves it to the reader to go behind the ALJ's decision and discern what about the exhibits cited contradict Miller's subjective symptoms complaints. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *26 ("The [ALJ's] decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

The gaps in the ALJ's reasoning cannot be overlooked as harmless. *See Rabbers*, 582 F.3d at 654. Miller's visits to Dr. Katirji lasted approximately 45 minutes. (Tr. 382, 410, 426). Objective examination at those treatment visits closest to the date last insured confirmed "abnormal" Cranial nerves III, IV and V, and "bilateral lateral rectus weakness L>R with double vision at the end of the gaze." (Tr. 384, 412, 428). That would be evidence consistent with Miller's testimony that her double vision occurred within 30 minutes of performing a task requiring her to focus, which would tend to support her claimed need to take breaks to alleviate

18

her symptoms. (Tr. 90–92). This was a potentially determinative issue, because the VE testified that the need to take breaks to alleviate eye fatigue would be work preclusive. (Tr. 101–02).

The Commissioner finds it significant that none of the state agency reviewers found Miller's visual impairment to be "severe" and that no physician assigned restrictions based on vision. ECF Doc. 9 at 6. Neither argument is persuasive. Whether Miller's visual impairment was "severe" is irrelevant, considering that the regulations require that the ALJ consider the impact of both severe and nonsevere impairments on Miller's functional capacity. 20 C.F.R. § 404.1545(a)(2); SSR 96-8p, 1996 SSR LEXIS 5, at *14. That Dr. Katirji and the state agency consultants didn't assign limitations to Miller's visual impairment would be substantial evidence to support the ALJ's conclusion. But that would not excuse the ALJ's failure to comply the regulation's articulation requirement. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006); *Fleischer*, 774 F. Supp. 2d at 877.

Moreover, the ALJ concluded: "[U]nlike the claimant's improvement in her hypertension from medication adjustments, the uncontrolled effects of the claimant's intermittent double vision that increased with fatigue has reasonably affected her residual functional capacity . . . ." (Tr. 13). Despite this, the ALJ only found that Miller was "limited to frequent near acuity activities." (Tr. 17). This is problematic in its own right, because the ALJ never explained how one who had "double vision that increased with fatigue" could focus on close-up objects "frequently" (up to 1/3 of the workday). SSR 83-10, 1983 SSR LEXIS 30, at *13. And the ALJ did not reconcile this finding with Miller's subjective symptom complaint that she needed visual breaks every hour.

In short, the ALJ failed to follow proper legal standards in evaluating Miller's double-vision symptoms. 42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405. The ALJ failed to build an

19

accurate and logical bridge between the evidence and her implicit finding that Miller's reported severity of her double-vision symptoms and need to take breaks was inconsistent with the medical evidence. *Fleischer*, 774 F. Supp.2d at 877. And the error cannot be overlooked as harmless in light of the VE testimony that the frequency of such breaks would exceed tolerances for off-task behavior. Thus, a remand is warranted to permit the ALJ to reconsider Miller's subjective symptom complaints regarding her double vision.

## IV. Conclusion

Because the ALJ failed to apply proper legal standards in her evaluation of Miller's vision-related subjective symptom complaints, the Commissioner's final decision denying Miller's application for DIB is vacated and Miller's case is remanded for further consideration.

**IT IS SO ORDERED.**

Dated: February 24, 2023

Thomas M. Parker
United States Magistrate Judge